# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

## No. ACM 40018

———————————

### UNITED STATES
*Appellee*

**v.**

### Philip C. KNODEL
Captain (O-3), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 8 March 2024

———————————

*Military Judge*: Jennifer E. Powell (pretrial motions); Brett A. Landry; Matthew P. Stoffel (post-trial hearing).

*Sentence*: Sentence adjudged 20 November 2020 by GCM convened at Joint Base Elmendorf-Richardson, Alaska. Sentence entered by military judge on 15 December 2020: Dismissal, confinement for 5 years, forfeiture of all pay and allowances, and a reprimand.

*For Appellant*: Major Jenna M. Arroyo, USAF; Captain Trevor N. Ward, USAF; Jack B. Zimmermann, Esquire; Terri R. Zimmermann, Esquire.

*For Appellee*: Colonel Matthew D. Talcott, USAF; Lieutenant Colonel Matthew J. Neil, USAF; Lieutenant Colonel G. Matt Osborn, USAF; Major Morgan R. Christie, USAF; Major Jocelyn Q. Wright, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, RICHARDSON, and CADOTTE, *Appellate Military Judges*.

Chief Judge JOHNSON delivered the opinion of the court, in which Senior Judge RICHARDSON and Senior Judge CADOTTE joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

JOHNSON, Chief Judge:

A general court-martial composed of a military judge alone found Appellant guilty, contrary to his pleas, of one specification of sexual assault, two specifications of assault, and one specification of unlawful entry, in violation of Articles 120, 128, and 129, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 920, 928, 929.[1,2] The military judge sentenced Appellant to a dismissal, confinement for five years, forfeiture of all pay and allowances, and a reprimand. The convening authority provided the adjudged reprimand but took no other action on the findings or sentence.

Appellant initially raised the following issues on appeal: (1) whether the evidence was legally and factually sufficient to support his convictions; (2) whether the military judge erred by admitting certain evidence of the victim's sexual predisposition under Military Rule of Evidence (Mil. R. Evid.) 412; (3) whether Appellant received ineffective assistance from his trial defense counsel;[3] (4) whether Appellant was denied due process of law because the military judge is presumed to have applied the erroneous definition of "reasonable doubt" from the model Air Force court member instructions; (5) whether the military judge erroneously denied a defense motion to compel discovery of a commander-directed investigation;[4] and (6) whether Appellant is entitled to relief under the cumulative error doctrine. This court granted a government motion to compel declarations from Appellant's trial defense counsel—Mr. GG, Mr. KS, and Major (Maj) PR[5]—addressing Appellant's claims of ineffective assistance of counsel. After receiving declarations from trial defense counsel, the Government's answer to Appellant's assignments of error, and Appellant's reply brief, this court returned the record to The Judge Advocate General and ordered additional proceedings in the nature of a factfinding hearing pursuant

---

[1] Unless otherwise indicated, references to the UCMJ, the Rules for Courts-Martial (R.C.M.), and the Military Rules of Evidence (Mil. R. Evid.) are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] The military judge found Appellant not guilty of one specification of sexual assault in violation of Article 120, UCMJ.

[3] Appellant filed his claims of ineffective assistance of counsel with respect to Mil. R. Evid. 412 under seal as a separate assignment of error, distinct from his other claims of ineffective assistance. We have consolidated our consideration of the assignments of error related to ineffective assistance for purposes of our analysis.

[4] Appellant personally raises issue (5) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[5] At the time of Appellant's trial, Maj PR was a captain. Maj PR subsequently separated from active duty in the United States Air Force and continued to practice law as a civilian attorney and as a member of the Air National Guard.

to Article 66(f)(3), UCMJ, 10 U.S.C. § 866(f)(3). The order directed, *inter alia*, that a detailed military judge would make findings of fact regarding a number of specified questions related to Appellant's claims of ineffective assistance of counsel.

A detailed military judge held a hearing as directed at which he received testimony from a number of witnesses, including among others all three trial defense counsel and Appellant, as well as other evidence and argument from counsel. After the hearing concluded, the military judge made written findings of fact, and a record of the additional proceedings including a verbatim transcript was compiled.

After the record, now including the additional proceedings, was re-docketed with this court, Appellant filed a supplemental brief providing additional argument with respect to ineffective assistance of counsel, challenging the military judge's findings of fact from the additional proceedings, and raising two additional assignments of error: (7) whether the military judge for the additional proceedings abused his discretion by denying a defense motion to compel the Government to pay for expenses related to one of the trial defense expert consultant's travel to and participation in the factfinding hearing; and (8) whether Appellant's Fifth Amendment[6] rights were violated during his post-trial confinement.[7] In addition, although not raised by Appellant, we have considered whether he is entitled to relief due to delay in the review of his appeal.

We have carefully considered issues (4), (5), (6), (7), and (8), and we find they do not require discussion or relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). As to the remaining issues, we find no error that materially prejudiced Appellant's rights, and we affirm the findings and sentence.[8]

# I. BACKGROUND[9]

Appellant met MB in the spring of 2016 at Tyndall Air Force Base (AFB), Florida, where they were both assigned for training as F-22 pilots. Although

---

[6] U.S. CONST. amend. V.

[7] Appellant personally raises issue (8) pursuant to *Grostefon*, 12 M.J. 431.

[8] Portions of the trial transcript, additional proceedings transcript, appellate exhibits, and appellate filings were sealed pursuant to R.C.M. 1113. These portions of the record and briefs remain sealed; however, counsel for both parties were permitted to review those materials. Any discussion of sealed material in this opinion is limited to that which is necessary for our analysis.

[9] The following background is drawn primarily from MB's trial testimony, supplemented by other evidence in the record.

Appellant and MB were in different training classes, they had some duty-re-lated contact and socialized at parties and similar events, and MB considered Appellant a friend.

After MB completed training at Tyndall AFB, she transferred to Joint Base Elmendorf-Richardson (JBER), Alaska, in August or September 2016. Appellant was also stationed at JBER after he completed training approximately six months later. Appellant and MB were assigned to different squadrons and had occasional and relatively limited on-duty interaction. However, they were both part of the broader community of F-22 pilots at JBER and continued to interact socially, to include exchanging text messages from time to time.

By the time the events underlying the charged offenses occurred in June 2019, several members of MB's squadron were aware MB identified herself as a "lesbian" and/or that she was dating a woman. MB told some of them directly about her sexual orientation, and some of them had met her then-girlfriend, HH.[10] However, at trial MB testified she did not recall directly telling Appellant about her sexual orientation or her girlfriend prior to the charged offenses.

In late February 2019, Appellant and MB sat on an alert shift together. As MB explained at trial, alert status is a 24-hour shift that two pilots will spend in a designated facility, prepared to respond on short notice in armed aircraft to unidentified aircraft or other potential threats. After Appellant and MB completed their assigned tasks for the day, they talked, ate dinner together, and watched television. According to MB's trial testimony, at one point Appellant asked MB if her neck was sore and offered to give her a neck massage. MB accepted, and Appellant massaged her shoulders down to her shoulder blades. MB estimated the massage lasted between five and ten minutes. At some point thereafter, Appellant and MB went to sleep in separate bedrooms which were part of the alert facility.

In approximately mid-April 2019, Appellant and MB exchanged text messages joking about their alert shift together. Appellant sent MB a text stating, "Just remember no one is as cool to sit alert with as me." MB responded, "That's true. [Another pilot's] back rub just wasn't the same," which she immediately followed with, "JUST KIDDING!!!"

In May 2019, members of Appellant's squadron organized a camping trip. Appellant and MB attended the trip and traveled to the location together in Appellant's vehicle. According to MB's trial testimony, at the campsite she did not "specifically remember talking to [Appellant] much [sic] as much as other people to include their wives as well." MB slept in her own tent and did not

---

[10] HH was a non-pilot active duty Air Force officer at the time.

respond to a late-night text from Appellant asking, "Sure you don't want a pillow??"

After the May 2019 camping trip, Appellant injured his shoulder while mountain biking. As a result, he was temporarily removed from flying status. In June 2019, Appellant and MB exchanged a series of texts regarding the fact that they had been scheduled to serve another alert shift together on 21 June 2019. They expressed mutual disappointment that Appellant's injury would prevent this. At one point, MB texted Appellant, "I traded just for you," meaning she had exchanged her position on the alert schedule in order to share a shift with Appellant again. At trial MB testified this statement was only a joke, that she traded shifts for another reason, and that trading alert shifts with other pilots was a common practice in her squadron.

Members of MB's squadron planned a camping trip for the following day, 22 June 2019. MB invited Appellant to attend, and Appellant accepted. Ten individuals participated in this trip—eight male pilots, all of whom were members of MB's squadron with the exception of Appellant; MB; and Captain (Capt) RL, a female non-pilot who was the fiancée of one of the pilots, Capt MO. Capt MO and another pilot, Capt RG, jointly owned a private two-seat aircraft; on 22 June 2019 they ferried participants by airplane one-by-one to a campsite next to a dirt landing strip.

When MB arrived at the campsite at around 2200,[11] several other individuals had already built a fire, set up some tents, and begun drinking alcohol. After she arrived, MB set up her own one-person tent near the others and began drinking alcohol as well. MB asked Appellant to help her set up her tent, which he did. The group socialized, prepared food, and ate around the fire. Most of those present, including MB and Appellant, also consumed alcohol. MB testified she recalled at one point going with Appellant and another pilot to urinate behind some bushes a short distance from the campfire. MB explained she "tried to time the dropping of [her] drawers to a time when they were not looking and then [she] quickly did that and ensured [she] was parallel to [Appellant] as to not expose [her]self." MB further explained she felt she was losing her balance and asked Appellant to hold her hand to keep her from falling over, which he did.

As the night went on, MB "felt very drunk;" at trial, on an intoxication scale of zero to ten, she testified she felt "slightly past nine." Capt MO and Capt RL, who had set up their tent a significant distance away from the rest of the group (and who were not drinking alcohol), were the first to leave the campfire. MB

---

[11] Due to the high northern latitude and summer solstice, the sky over the campsite never became entirely dark on the night of 22–23 June 2019.

was the next to leave. She walked to her tent, not responding when someone called out to her. There she went inside; closed the tent behind her; removed her shoes, "outer pants," and jacket; and climbed into her sleeping bag wearing a long-sleeved t-shirt and "military issued long johns." MB zipped up her sleeping bag and fell asleep.

At trial, MB described her memory of the following events that took place in her tent that night as "fragmented." MB recalled waking up, seeing "a shadow at the bottom of [her] tent," and feeling "alarmed."

MB's next memory was of "actively vomiting" with her head outside her tent and her body inside it. She sensed another person was also inside the tent, "extremely close" to her so that she felt and smelled their breath. MB recalled the person was speaking, initially "saying something along the lines of that is okay, it is going to be okay." Then the person laughed and MB "really knew" it was Appellant because she had "heard his laugh a million times." Appellant then told her, "I think you're going to need to clean your footprint," referring to the protective covering underneath the tent. MB testified she "felt very panicked" at that moment due to being "alone with [Appellant] in a vulnerable situation."

MB's next memory was of Appellant "ripping [her] pants off with both hands around [her] waist and then [her] long johns being pulled off [her] body." MB testified she wanted to scream, to tell Appellant "no," and to kick, but her body would not respond. MB was menstruating and had a tampon inserted; Appellant pulled out her tampon "very very aggressively." MB testified:

> I remember [Appellant] laying on top of me with his body weight and his right arm was on the ground and I remember hearing him spit to lick or to spit into his hand and I remember seeing his hand go down like oh my God he is going to maybe finger me and I did not feel anything and he brought it back up and spit again and he went back down again and I said oh my God he is probably going to touch his penis and he is going to put his penis inside of me. So, I was telling my whole body to close my legs and to close my arms and to turn over and to say no. The only limb I could move was my right hand and I put it in front of my vagina hoping that would tell him no and he would see that and stop.

When MB moved her hand to block Appellant, she felt something "wet," "hard," and "slimy," which "felt like skin" but she "could not necessarily identify it."

MB's next memory was "feeling like [she] was about to orgasm and wanting it to stop because [she] did not want it to happen." She "reached down and grabbed what was inside of [her] and pulled it out and rotated it away from [her] body in an arcing motion and rotated it inside [her] hand as [she] did

6

that." MB described what she felt in her hand as "something skin, but it was firm, it was about the circumference of maybe of two fingers, but it was not[,] it did not feel digital and it felt very spherical not kind of oblonggated [sic] like fingers do." MB felt "very angry, very disgusted, very sad." She felt she could not say anything despite trying, and she did not recall Appellant saying anything at that point.

MB's next memory was of Appellant vomiting outside the tent, with his body partly inside and partly outside. Appellant then moved back inside the tent and said, "I need to go pee, do you want me to come back?" MB told him, "I think it is best that you leave my tent."

MB's next memory was of waking up in the morning, inside her tent but outside her sleeping bag and naked from the waist down. The zipper to the front of her tent was open. MB inserted a new tampon and put her long johns and pants back on, which made her feel pain in her vagina. She found the tampon Appellant had removed, which was "bloody and gross," and she sealed it inside a plastic bag. MB packed up her tent and attempted to clean the vomit off of the tent's footprint. She then tried to find where Capt MO and Capt RL had camped, because Capt MO had not been drinking the night before and would be able to fly her out of the campsite to "get a forensic exam" and get the Sexual Assault Prevention and Response (SAPR) "process started." Once Capt RG awoke, MB asked him if he could fly her out, but he declined. Because MB's cell phone could not get reception at the campsite, she used another camper's phone to call a friend in Anchorage to pick her up once she was able to fly back.

MB continued to look for Capt MO's campsite, accompanied by another camper, Capt DF; MB estimated they "walked around for almost two hours" searching. MB did not tell Capt DF about the events in her tent the previous night. Eventually they decided to return to the campsite, but MB stopped because she "just could not" go back. She began crying and asked Capt DF to hug her, which he did. Capt DF stayed with MB for a while longer before leaving to "go to the bathroom."

After Capt DF left, Appellant walked to where MB was sitting and attempted to speak to her. MB told Appellant she needed her sunglasses and walked away from him. Later on, Appellant approached MB again and asked if they could talk. MB told him she had nothing to say to him. According to MB's trial testimony, they had the following exchange:

> He said, "We did not have sex last night." And I said, "How am I supposed to know that?" And he said, "Oh, you don't remember"? And I said, "No, I did not say that." And he said, "Look, it was just hand stuff both ways. You even said you were happy I was

7

there" and I remember I lost it because there was no way that I said that. So, I said, "I have nothing to say to you" and I walked away.

MB was eventually able to contact Capt MO by radio and told him she needed to leave right away, though she did not say why. After Capt MO flew her back, MB made phone calls to obtain information about the SAPR process and called her girlfriend, HH, who was on temporary duty away from Alaska at the time. MB was eventually able to return to Anchorage on the afternoon of 23 June 2019.

The same day, she went to a civilian hospital and underwent a sexual assault forensic examination (SAFE). During the examination, the sexual assault nurse examiner (SANE) identified a laceration in MB's genital area, as well as a bruise on her forearm. At trial, the SANE who examined MB testified the laceration was in a location commonly injured when a female is lying on her back during consensual or nonconsensual penetration by a penis or other object. A follow-up examination on 28 June 2019 identified several bruises on MB's right thigh and below her right knee.

In the course of the SAFE, MB described some but not all of the events from the preceding night that she testified to at trial. MB described waking up with someone in her tent; vomiting with her head outside her tent; Appellant aggressively removing her long johns and tampon; Appellant spitting on his hand; and MB attempting to block Appellant with her hand. MB reported her next memory was her vagina feeling very sore when she woke up the following morning. MB also summarized the events of that morning, including part of her conversation with Appellant in which he denied they "had sex." She did not report penetration of her vulva.

Also on 23 June 2019, Appellant sent MB the following text message:

Hey I am pretty confused about this morning. You are a really good friend of mine [MB] and I have a lot of respect for you and how hard you work. I thought by some of the alert things, having me hold your hand while you were peeing last night, etc[.] that you had interest in being more than friends but if that was not what any of that was please let me know. We did not even come close to having sex last night which I thought you very much knew and based on all of your actions and words the extremely limited touching we did do I thought you were 100% on board with. I'm just trying to understand the reversal this morning so that I know if in your mind I did something wrong I can apologize or if you just prefer not to do any of those things and don't view me like that.

Initially, MB did not respond to this message.

MB first made a restricted report of sexual assault, but later made an unrestricted report. MB was interviewed by the Air Force Office of Special Investigations (OSI). During her initial OSI interview, MB related a version of events substantially similar to what she had reported during the SAFE. After the OSI interview, MB remembered additional details including: Appellant vomiting outside the tent; Appellant asking MB if he should return after urinating and MB telling him it was best if he left; and the part of her conversation with Appellant in which Appellant stated MB had told him she was "happy" he came to her tent. MB reported these additional memories via email to her Special Victims Counsel (SVC) at the time, Maj HG,[12] who relayed them to OSI.

On 27 June 2019, at OSI's request, MB responded to Appellant's 23 June 2019 text quoted above, stating she was "trying to figure out what happened." Appellant and MB exchanged a series of messages wherein Appellant, *inter alia*, told MB he had spoken with a chaplain, apologized if his "perception didn't meet reality if that's the case," and insisted they did not "have sex" and only touched each other with their hands. MB told Appellant, *inter alia*, she was unusually sore "down there" and pressed Appellant for more information about what happened. Appellant told MB "it was essentially what we did when we were at alert and you reciprocated touching my body." In response to this, MB wrote:

> When we were at alert we were in a common area. With our clothes on. Nothing about that suggested anything about coming into a privet [sic] area of mine, taking my pants off and tampon out!!! You called me your sister, please if you truly care for me, tell me what happened to make me sore, that's all I want to know.

In response, Appellant did not deny removing MB's clothing or tampon, but wrote: "This doesn't all square in my mind. Nothing we did should have made you sore there . . . ." Appellant expressed he was uncomfortable with what MB was "insinuating" and with discussing the matter further via text. Appellant suggested he and MB meet in the presence of a third party such as a chaplain. MB and Appellant did not meet again in person.

According to MB's trial testimony, on 15 August 2019 she recovered the memory of Appellant penetrating her and MB removing with her hand

---

[12] Maj HG represented MB from June 2019 until 28 August 2019. MB was represented by a second SVC between 28 August 2019 and 10 December 2019, and by a third SVC thereafter.

whatever part of Appellant was inside of her. MB testified that on 15 August 2019 she was at a restaurant with HH. MB saw a man enter the restaurant who "looked just like" Appellant, which caused her to freeze and then immediately leave the restaurant. MB testified she called her then-SVC, Maj HG, the following day to report the recovered memory. However, this memory was not reported to OSI or to trial counsel until a pretrial interview with trial counsel on 13 November 2020, three days before Appellant's court-martial began on 16 November 2020.

Forensic analysis of evidence collected from the SAFE indicated Appellant's DNA was present on swabs taken from the tampon MB inserted on the morning of 23 June 2019, from MB's external genitalia, and from a finger on MB's left hand. Appellant's DNA was not identified on samples taken from MB's internal genitalia or the string of the tampon Appellant removed.

Appellant was charged with two specifications of violating Article 120, UCMJ, by penetrating MB's vulva with his fingers and with his penis without her consent; two specifications of violating Article 128, UCMJ, by forcibly removing her long johns and tampon; and one specification of violating Article 129, UCMJ, by unlawfully entering MB's tent. The military judge found Appellant not guilty of penetrating MB's vulva with his fingers, and guilty of the other specifications.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

#### 1. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). "Our assessment of legal and factual sufficiency is limited to the evidence produced at trial." *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citation omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (citation omitted). "[T]he term 'reasonable doubt' does not mean that the evidence must be free from any conflict . . . ." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). Thus, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *King*, 78 M.J. at 221 (alteration in original)

(citation omitted). "The [G]overnment is free to meet its burden of proof with circumstantial evidence." *Id.* (citations omitted).

"The test for factual sufficiency is 'whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *Rodela*, 82 M.J. at 525 (second alteration in original) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

**2. Analysis**

### a. Sexual Assault

In order to convict Appellant of sexual assault as alleged in Specification 2 of Charge III, the Government was required to prove that on or about 23 June 2019, in the state of Alaska, Appellant committed a sexual act on MB—specifically, penetrating her vulva with his penis—without her consent. *See* 10 U.S.C. § 920(b)(2)(A). An honest and reasonable mistake of fact as to the existence of consent is an affirmative defense to sexual assault under Article 120(b)(2), UCMJ. *See* Rule for Courts-Martial (R.C.M.) 916(j)(1); *Rodela*, 82 M.J. at 526.

### i) Evidence Supporting the Conviction

The Government introduced sufficient evidence for a rational trier of fact to find Appellant guilty of sexual assault beyond a reasonable doubt. Although MB's memory of the events was fragmentary, she testified she remembered Appellant being in her tent on the night of 22–23 June 2019, aggressively removing her long johns and tampon, and spitting on his hand. When she moved her hand to block her vagina, she felt something like skin press against her hand. She then recalled feeling something inside her which she pulled out; she described it as feeling like skin and approximately the thickness of two fingers, but not shaped like fingers. MB testified she did not consent to Appellant's acts. Moreover, although she and Appellant were friends there was no evidence they had any prior sexual relationship.

Although there were no other witnesses to the sexual assault itself, other evidence supported MB's testimony. Every other person on the camping trip—excluding Appellant—was called to testify at Appellant's trial. They generally agreed MB and Appellant were drinking alcohol, and that MB was the next to leave the campfire and go to her tent after Capt MO and Capt RL. Two

witnesses recalled hearing MB vomiting at some point during the night after they had gone to bed. Capt DF confirmed walking around with MB the following morning searching for Capt MO, that she did not want to return to the campsite, and that she asked for a hug. Several witnesses testified they noted MB seemed to be upset or anxious that morning and in a hurry to leave the campsite, and she was in fact the first to be flown out. A rational factfinder could also consider MB's immediate reporting of the assault and the results of the medical examinations and forensic analysis, including the discovery of the genital laceration, the presence of Appellant's DNA on MB's external genitalia, tampon, and finger, and bruises on her arm and leg, as tending to confirm aspects of MB's testimony.

Appellant raises several arguments regarding the sufficiency of the Government's proof; we address the most significant of these below, grouped into three general categories.

### ii) Appellant's Arguments – MB's Credibility Generally

Although witnesses generally agreed MB seemed upset, anxious, and eager to leave the campsite on 23 June 2019, Appellant contends this could have been due to MB either feeling hung over after excessively consuming alcohol the night before, feeling guilty about engaging in consensual sexual activity with Appellant despite having a long-term romantic partner, or both. Similarly, Appellant contends MB's desire to protect her relationship with HH provided her a motive to deny any consensual sexual activity with Appellant. However, the military judge observed MB's testimony and evidently found her version of events generally credible. Moreover, the military judge could have reasonably found MB's near-immediate reporting of the sexual assault indicative of MB's actual lack of consent.

Appellant challenges the reliability of MB's testimony regarding her memories of the sexual assault. He cites the testimony of the Defense's expert witness and consultant in forensic psychology, Dr. CR, who testified at trial about memory and the effects of alcohol. Dr. CR testified, *inter alia*, that where an individual has alcohol-induced "fragmentary blackouts," it is possible the individual will "fill in the blanks" in an "ego-syntonic" way, meaning a way that is consistent with her belief as to how she would behave. In other words, individuals "tend to fill things in as [they] think they should be, rather than as they necessarily are." Dr. CR additionally testified about post-event suggestibility, explaining that if someone describing a memory is "reinforced or praised, or they feel satisfaction that they finally figured it out, that increases their confidence, but not the accuracy of what they're saying." Dr. CR also testified that memory tends to become more unreliable over time due to multiple factors. However, in response to questioning by trial counsel and the military judge, Dr. CR acknowledged it is possible to "retrieve a repressed memory," that a

memory can be "cued" or brought back by "something," and that "[a]nything that arouses you or gets your attention would be more likely to be encoded" in one's memory. Although Dr. CR's testimony was relevant, the military judge could nevertheless find MB's testimony—in combination with the other evidence adduced at trial—sufficiently reliable to find Appellant guilty beyond a reasonable doubt.

Appellant cites the testimony of MU,[13] who the Defense called to rebut MB's testimony that she had never been penetrated by a penis prior to 23 June 2019.[14] MU's spouse was a member of MB's squadron when MB was stationed at JBER, and MU knew MB socially. On direct examination, MU testified that MB once told her MB was "not a virgin" with respect to men. Trial counsel's cross-examination elicited more context for this purported statement. Trial counsel elicited that MB had told MU something to the effect that MB had a bad experience with a man, was "turned off from guys," and was a lesbian. Later that night, MU had asked MB whether she had "tried the d**k," and MB responded she had. MU then asked MB if she "was going to miss the d**k," and MB replied she would not and reiterated she was "just turned off by guys." This evidence was not as compelling as Appellant suggests. Based on MU's testimony, it is possible MU incorrectly inferred MB was referring to sexual intercourse when in fact MB was referring to some other experience with a man. It is possible that MB intentionally misled MU to believe MB had sexual intercourse with a man when she had not, and later told the truth during her SAFE and under oath at trial. It is possible the military judge did not find MU's testimony credible. In any case, a rational factfinder could find MB's testimony about the sexual assault credible notwithstanding MU's testimony.

### iii) Appellant's Arguments – Consent and Mistake of Fact

Appellant cites evidence that he contends indicates either MB consented to sexual activity with Appellant, or Appellant reasonably believed MB consented. Appellant lists a number of facts known to MB which would have indicated to her that Appellant was interested in being more than friends, including *inter alia* Appellant massaging her during their alert shift, Appellant inviting MB to the May 2019 camping trip and riding there together, Appellant accepting MB's invitation to the June 2019 camping trip, MB asking Appellant to help her set up her tent, MB going with Appellant to urinate and asking him to hold her hand while doing so, and MB never telling Appellant about her sexual orientation or girlfriend. However, a rational factfinder could conclude

---

[13] MU testified by telephone.

[14] MB had made similar statements during her SAFE and OSI interviews.

none of these facts indicated, or created a reasonable belief on Appellant's part, that MB consented to sexual intercourse with him.

Appellant also cites his text messages to MB on 23 June 2019 and thereafter as indicating Appellant believed MB consented to the activity in her tent. However, a rational factfinder could reasonably discount the reliability of Appellant's self-serving statements to MB after the incident. Similarly, the military judge could reasonably find Appellant's insistence that he and MB had not "come close to having sex" unpersuasive, and even indicative of consciousness of guilt, if the military judge also found MB's testimony and the forensic evidence persuasive.

### iv) Appellant's Arguments – Forensic Evidence

Appellant contends the DNA evidence supports Appellant's claim to MB that they only engaged in "hand stuff"—that is, touching each other with their hands. Appellant's DNA found on the swab of MB's external genitalia could have been deposited from Appellant's hand. Moreover, he contends, Appellant's DNA found on the tampon MB inserted on the morning of 23 June 2019 could have resulted from MB touching Appellant the night before and then using the same hand to insert the tampon. However, Dr. DW, the Government's expert witness in forensic biology, testified that the absence of DNA on a surface is not proof that the surface was not touched. A rational factfinder could conclude that, notwithstanding the absence of Appellant's DNA from MB's internal genital swab, the presence of his DNA on the tampon she inserted after the incident could be explained by Appellant having penetrated her vulva. Similarly, a factfinder could determine the presence of a fresh laceration in MB's genital area in a location commonly injured during penile penetration tended to corroborate MB's testimony—even if there were alternate possible explanations for the injury. Moreover, the military judge could reasonably find the soreness in MB's vagina she described during her SAFE and her testimony, as well as the arm and leg bruises identified by the SANEs, also tended to support her testimony that Appellant penetrated her without her consent.

### b. Assault

In order to convict Appellant of assault as alleged in Specifications 1 and 2 of Charge II, the Government was required to prove that on or about 23 June 2019, in the state of Alaska, Appellant: (1) did bodily harm to MB, specifically by "forcibly removing her long johns" and "forcibly removing a tampon from inside her vulva;" (2) the bodily harm was done unlawfully; (3) the bodily harm was done with force or violence; (4) MB was a commissioned officer; and (5) Appellant knew MB was a commissioned officer. *See* 10 U.S.C. § 928(a)(3); *Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV,

¶ 77.b.(3)(a). "'Bodily harm' means an offensive touching of another, however slight." *MCM*, pt. IV, ¶ 77.c.(1)(a). "[C]onsent 'can convert what might otherwise be offensive touching into non-offensive touching.'" *United States v. Mader*, 81 M.J. 105, 108 (C.A.A.F. 2021) (quoting *United States v. Johnson*, 54 M.J. 67, 69 (C.A.A.F. 2000)). An honest and reasonable mistake of fact as to consent is an affirmative defense to the offense of assault consummated by a battery. *Id.* (first citing R.C.M. 916(j)(1) (*Manual for Courts-Martial, United States* (2016 ed.)); and then citing *United States v. Greaves*, 40 M.J. 432, 433 (C.M.A. 1994)).

MB testified she remembered Appellant "ripping" her long johns from around her waist and pulling them off her body. Appellant then "reach[ed] in and pinch[ed] out [her] tampon . . . very very aggressively." MB did not consent to either of these actions. MB was a commissioned officer at the time, as Appellant knew. Based on MB's testimony, the Government introduced sufficient testimony to support both Article 128, UCMJ, specifications.

Appellant makes several arguments asserting the Government failed to prove his guilt beyond a reasonable doubt. He notes that according to MB's testimony she did not recall what occurred immediately before her memory of Appellant removing her long johns, and suggests it is possible MB actually invited Appellant to do so or even assisted him. However, if that were the case, MB's testimony regarding her reaction to the removal of her long johns—that she "wanted to scream, and [she] wanted to say no, and [she] wanted to kick so that he leaves [her] alone"—would make no sense. Appellant contends MB's testimony that she did not scream or resist tended to support a reasonable mistake of fact on Appellant's part that MB consented to his conduct, as Appellant claimed to MB after the fact. However, a rational factfinder could reasonably conclude that under the totality of the circumstances that any such belief on Appellant's part was not reasonable. MB testified, and other witnesses supported, she went to her tent alone to sleep after becoming heavily intoxicated. She had no prior sexual relationship with Appellant and had made no such plans with him. After Appellant arrived, she vomited outside her tent in his presence. She was menstruating and had a tampon inserted. Appellant's self-serving statements after the fact that he believed she consented to "limited touching," inquiring about how much she remembered, and denying they "c[a]me close to having sex" could be interpreted as consciousness of guilt.

Specifically with regard to removing the tampon, Appellant contends he would have known to remove it only if MB told him one was inserted, implying she told him to remove it. We are not persuaded. Appellant further notes Appellant's DNA was not found on the tampon string, but as stated above the Government's expert forensic biologist testified the absence of detected DNA is not proof an item was not touched. Based on the totality of the evidence, the

military judge could reasonably conclude that Appellant did in fact remove MB's tampon.

### c. Unlawful Entry

In order to convict Appellant of unlawful entry as alleged in the Specification of Charge I, the Government was required to prove that on or about 23 June 2019, in the state of Alaska: (1) Appellant entered the personal property of MB which amounted to a structure usually used for habitation or storage, specifically her tent; and (2) the entry was unlawful. *See* 10 U.S.C. § 929(b)(2); *MCM*, pt. IV, ¶ 79.b.(2). "An entry is unlawful if made without consent of any person authorized to consent to entry or without other lawful authority." *MCM*, pt. IV, ¶ 79.c.(3). No specific intent to commit an offense is required. *MCM*, pt. IV, ¶ 79.c.(5)(b).

MB testified that after she went to sleep inside her sleeping bag in her tent, she awoke to see a person "at the bottom of her tent." Although she did not immediately know who it was, her subsequent fragmentary memories clearly indicated it was Appellant. MB had not invited Appellant to enter her tent or otherwise consented for him to be there. The Government introduced sufficient evidence that Appellant entered MB's tent unlawfully—that is, without consent or other lawful authority.

Appellant cites his later claim to MB the following morning that MB told him she was "happy [he] was there" as evidence she in fact consented to his entry into the tent. However, MB reacted angrily to this statement because she knew there was "no way" she would have said that, and the military judge was not bound to find Appellant's claim credible. Moreover, even if MB had said such a thing without remembering it, there is no indication she said it before Appellant entered the tent. On the contrary, MB's first memory after "waking up" in her tent was of the person—Appellant—being inside the tent, after the entry was accomplished. Appellant makes additional arguments similar to those above regarding MB's fragmented memory, and the likelihood that she remembered events in an unreliable and "ego-syntonic" way. However, for reasons similar to those stated above, a rational factfinder could reasonably conclude MB did not actually consent to Appellant entering the tent, and Appellant did not *reasonably* believe she did consent.

### d. Conclusion as to Legal and Factual Sufficiency

Accordingly, we find Appellant's convictions legally sufficient. In addition, having weighed the evidence in the record of trial, and having made allowances that we did not personally observe the witnesses, we are ourselves convinced of Appellant's guilt beyond a reasonable doubt.

**B. Mil. R. Evid. 412**

Appellant contends the military judge erred by admitting evidence offered by the Government regarding MB's sexual orientation, where such evidence of sexual predisposition or behavior was generally inadmissible under Mil. R. Evid. 412 and no exception applied. We find Appellant waived this objection and no relief is warranted.

**1. Additional Background**

Before trial, the Government moved to introduce two types of evidence subject to Mil. R. Evid. 412. First, the Government sought to introduce evidence of "MB's sexual orientation," as indicated in the OSI report of investigation and interviews of MB. The Government contended such evidence was relevant "to rebut a reasonable mistake of fact defense." Second, the Government sought to introduce evidence of "MB's lack of sexual intercourse experience" with men, as indicated in MB's OSI interview, which the Government contended was "relevant as to the issue of consent and also to prove penile penetration." Citing *United States v. Banker*, 60 M.J. 216, 219 (C.A.A.F. 2004), the Government asserted Mil. R. Evid. 412 "was intended to safeguard the alleged victim against the invasion of privacy and potential embarrassment that is associated with public disclosure of intimate sexual details and the infusion of sexual innuendo into [the] fact-finding process," and thereby "encourage[ ] victims of sexual misconduct to institute and to participate in legal proceedings . . . ." (Internal quotation marks and citations omitted). However, the Government asserted, in this case MB "was not asking for this protection" as it related to her sexual orientation and lack of sexual intercourse experience.

The Defense did not oppose the Government's motion, but instead moved to be allowed to introduce additional Mil. R. Evid. 412 evidence in response. Specifically, the Defense asserted it intended to cross-examine MB regarding certain alleged past behavior and comments she had made, and to call a witness in the event MB denied the conduct. The Defense asserted such evidence would be admissible pursuant to Mil. R. Evid. 412(b)(3).

During the court-martial, the military judge held a closed hearing to discuss matters related to Mil. R. Evid. 412, including the Government's motion. At the hearing the military judge sought to clarify the Government's position with regard to evidence of MB's sexual orientation. He asked trial counsel to "confirm" whether "it is part of the [G]overnment's case or it will be at least argument that it undercuts any potential mistake of fact defense and is possibly relevant to the element of consent that her sexual orientation was that she was a lesbian[.]" Trial counsel responded, "Correct." Later, the military judge asked MB's SVC if she had "[a]nything to add . . . in regard to sexual orientation and what that potentially opens the door to[.]" The SVC responded, "No,

Your Honor," and then agreed with the military judge that MB was "on the same page of the [G]overnment." Trial defense counsel did not object to the Government's proposed Mil. R. Evid. 412 evidence, but maintained their intention to introduce additional Mil. R. Evid. 412 evidence in response. The military judge deferred ruling on the admissibility of the Defense's responsive Mil. R. Evid. 412 evidence.

The military judge subsequently issued a written ruling on Mil. R. Evid. 412 evidence. With regard to the Government's proffered Mil. R. Evid. 412 evidence of MB's sexual orientation and lack of prior sexual experience with men, the military judge explained:

> [MB] (through counsel) has concurred that such evidence should be admitted. Evidence of sexual orientation is clearly covered by [Mil. R. Evid.] 412 and the rule is not a legal privilege[;] however the [c]ourt gives great weight to the position of the alleged victim in this case as a person of limited standing given the purpose of the rule. Given no objection under [Mil. R. Evid.] 412, the [G]overnment may introduce evidence of [MB's] sexual orientation relevant to the element of lack of consent.

> However . . . [s]hould the [G]overnment seek to use the victim's sexual orientation as a sword to show that she would not have consented to engage in sexual acts with [Appellant], the [D]efense will likely be permitted to introduce evidence that shows [MB] may have previously engaged in sexual acts with men. As this issue is not ripe, the [c]ourt directs the [D]efense to request an additional closed hearing under [Mil. R. Evid.] 412 to take up this issue prior to adducing such evidence through cross-examination of [MB] or other means.

On direct examination, MB testified *inter alia* that at the time of the June 2019 camping trip, she had a girlfriend, HH, to whom she later became engaged. She also testified that prior to 22–23 June 2019, she had never been penetrated by a penis. After MB's direct examination, the military judge held another closed hearing to address the Defense's proposed Mil. R. Evid. 412 rebuttal evidence. The Defense contended MB's testimony opened the door to certain rebuttal evidence subject to Mil. R. Evid. 412. The military judge agreed and permitted trial defense counsel to introduce evidence regarding Appellant's knowledge—or lack thereof—of MB's sexual orientation as well as certain other alleged prior statements or acts by MB. During the hearing, civilian trial defense counsel noted, "it sounds like government counsel has reserved the right to argue that because she is a lesbian she would not consent." As the military judge issued his oral ruling, he noted trial counsel had

indicated the Government "may argue during closing argument" that MB's "sexual orientation" was "part of the proof" that MB did not consent.

After the closed hearing, the trial resumed in open court with the Defense's cross-examination of MB. During cross-examination, civilian trial defense counsel elicited *inter alia* that MB could not recall disclosing her sexual orientation or relationship with HH to Appellant; that MB could not recall telling MU that she previously had "sexual intercourse with a man or that [MB] had ever been penetrated by a penis," and if she had said that it would have been "a lie," which she possibly might have said as "a joke;" and that MB had a prior sexual experience with a man that did not involve penile penetration.[15]

As the trial progressed, trial counsel elicited from every witness who participated in the June 2019 camping trip that they were aware of MB's sexual orientation. The Government also introduced the SAFE report which included MB's statements to the SANE that she was "a virgin" and was "dating a woman." Trial defense counsel did not object to this evidence. During its case-in-chief, the Defense called MU, who testified to the effect that on one occasion prior to June 2019 MB told MU that MB was not a virgin.[16]

Trial counsel's closing argument included the following:

> People do not become different in a blackout than they are normally. It doesn't change who you are as a person. It doesn't create desires that are not there. . . . [T]he facts establish that she wouldn't have consented, given who she is, given where her desires are. . . .

In addressing the possibility of a mistake of fact as to consent, trial counsel argued:

> [N]othing that approached this level of intimacy between the two of them as to what happened in the tent that night, to let him think that was okay. She was drunk. She talked about feeling nine out of . . . sliding past nine into ten, where we described ten as being passed out, stuporish. She's out camping. She hasn't showered. She hasn't brushed her teeth. She's thrown up. She is 31 years old at this point in her life and she is a virgin. All the opportunities that she could have had to engage in this type of behavior had she wanted to and she doesn't. She's on her period

---

[15] On redirect examination, MB described this sexual experience as "repulsive," and it caused her to conclude she "definitively did not want to be with men."

[16] MU's testimony is described in more detail in Section II.A.2.a, *supra*, with respect to legal and factual sufficiency.

and she's gay, and every single other person on the camping trip knew it, every single one. [Appellant's] roommates knew it.[17] Now, some knew because she told them. Some had just heard about it in the community as people will invariably talk about the only female F-22 pilot here. She has no specific memory of telling [Appellant] because, at that point in her life, it wasn't that big of a deal to her. Yes, she confided to some people in the past; but, at this point in her life, she's accepted who she was, who she is. Don't ask, don't tell is no longer a barrier. She's in a happy, thriving relationship. She's brought her significant other to squadron events. She is fully out in public and she's proud.

(Omission in original).

Trial defense counsel did not object to trial counsel's references to MB's sexual orientation.

**2. Law**

Mil. R. Evid. 412(a) provides that in any proceeding involving an alleged sexual offense, evidence offered to prove the alleged victim engaged in other sexual behavior or has a sexual predisposition is generally inadmissible, with three limited exceptions. These exceptions include:

> (1) evidence of specific instances of a victim's sexual behavior, if offered to prove that someone other than the accused was the source of semen, injury, or other physical evidence;

> (2) evidence of specific instances of a victim's sexual behavior with respect to the person accused of the sexual misconduct, if offered by the accused to prove consent or if offered by the prosecution; and

> (3) evidence the exclusion of which would violate the accused's constitutional rights.

Mil. R. Evid. 412(b).

In general, we review a preserved objection to the military judge's ruling to admit or exclude evidence pursuant to Mil. R. Evid. 412 for an abuse of discretion. *United States v. Ellerbrock*, 70 M.J. 314, 317 (C.A.A.F. 2011) (citing *United States v. Roberts*, 69 M.J. 23, 26 (C.A.A.F. 2010)). "A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if his application of the correct legal principles to

---

[17] Two of the June 2019 campers who testified at trial were Appellant's roommates.

the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citation omitted). However, failure to object may result in waiver or forfeiture of the issue. *See United States v. Ahern*, 76 M.J. 194, 197 (C.A.A.F. 2017).

"Whether an accused has waived [or forfeited] an issue is a question of law we review de novo." *Id.* (citation omitted). "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *United States v. Davis*, 79 M.J. 329, 331 (C.A.A.F. 2019) (quoting *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009)). Appellate courts generally review forfeited issues for plain error, but "a valid waiver leaves no error to correct on appeal." *Id.* (citation omitted). However, Article 66, UCMJ, 10 U.S.C. § 866, empowers a Court of Criminal Appeals to decline to apply forfeiture or waiver in order to address a legal error at trial, if warranted. *See United States v. Hardy*, 77 M.J. 438, 442–43 (C.A.A.F. 2018) (citations omitted).

**3. Analysis**

Appellant asserts on appeal that evidence of MB's sexual orientation and purported virginity was inadmissible evidence of MB's sexual predisposition and behavior under Mil. R. Evid. 412 because no exception applied. Appellant acknowledges the Defense failed to object to this evidence at trial and contends this court should find plain error. Alternatively, in the event this court finds the Defense waived the issue at trial, Appellant asks this court to pierce waiver pursuant to our Article 66, UCMJ, authority and correct the alleged error.

We find the Defense did waive this issue at trial. The Government's Mil. R. Evid. 412 motion put the Defense on specific notice of trial counsel's intent to introduce evidence of MB's sexual orientation and absence of prior sexual intercourse with men. Instead of objecting, the Defense moved to be permitted to introduce other Mil. R. Evid. 412 evidence in response. Notably, the military judge cited and gave weight to the absence of a defense objection in his ruling permitting the Government's Mil. R. Evid. 412 evidence. Moreover, the trial progressed in accordance with the Defense's position: the Government adduced the expected evidence without objection, and the military judge permitted the Defense to introduce its responsive evidence. Furthermore, the record indicates both the military judge and trial defense counsel anticipated trial counsel might use evidence of MB's sexual orientation not only with respect to the defense of mistake of fact as to consent, but as evidence that MB did not consent. In short, the Defense's decision not to oppose this evidence was not an "oversight," but "an intentional relinquishment of a known right." *United States v. Campos*, 67 M.J. 330, 332 (C.A.A.F. 2009) (citations omitted).

Although we recognize our authority to pierce waiver in order to safeguard Appellant's right to a fair trial, we find no cause to do so here. The record reflects trial defense counsel made a conscious decision not to oppose the Government's Mil. R. Evid. 412 evidence, but instead to allow it to open the door to additional defense Mil. R. Evid. 412 evidence they believed would undermine MB's credibility. Having decided upon a particular trial strategy, the Defense is not entitled to a second trial in order to try a different strategy. Accordingly, Appellant cannot prevail on this issue.

## C. Ineffective Assistance of Counsel

### 1. Additional Background

In his initial brief to this court, Appellant asserted his trial defense counsel—Mr. GG, Mr. KS, and Maj PR—were ineffective in multiple respects. Specifically, Appellant alleged trial defense counsel failed to: (1) adequately investigate, prepare, and advocate Mil. R. Evid. 412 matters; (2) discover, request production of, and call witnesses to present findings evidence regarding Appellant's character for peacefulness, non-violence, law abidingness, respectfulness toward women, and good military character; (3) discover, request production of, and present sentencing witnesses; (4) present evidence of MB's character for untruthfulness and untrustworthiness; (5) prepare Appellant to testify and call him to testify in findings and sentencing; (6) adequately prepare and cross-examine witnesses; (7) investigate MB's claim that she told her SVC about her recovered memory of penetration; (8) explain Appellant's call sign "Smash;" (9) request production of a particular witness related to Mil. R. Evid. 412 evidence; (10) invoke Mil. R. Evid. 615 to exclude witnesses from the courtroom; (11) move to exclude or object to MB's testimony that pilots dared one another to have sex with women; (12) adequately communicate with Appellant during their representation; and (13) object to MB's unsworn statement offered pursuant to R.C.M. 1001(c). In support of these arguments, in addition to various citations to the record, Appellant moved to attach declarations from himself and numerous witnesses and potential witnesses, as well as other documents.

In response, the Government moved this court to compel declarations from trial defense counsel responding to Appellant's allegations of ineffective assistance. This court granted the motion and ordered Mr. GG, Mr. KS, and Maj PR to provide affidavits or declarations responding to Appellant's claims in ten enumerated respects. After trial defense counsel provided their declarations and the Government submitted its answer brief, this court ordered additional proceedings in the nature of a factfinding hearing pursuant to Article 66(f)(3), UCMJ. The order required a military judge be detailed to "fully explore and address" numerous specified questions grouped into several subject matter

areas related to Appellant's ineffective assistance claims, and to provide this court with written findings of fact.[18]

A military judge was duly detailed to the additional proceedings, which were conducted over the course of four days. The military judge received testimony from numerous witnesses, including all three trial defense counsel and Appellant himself, as well as other evidence, opening statements, and closing arguments from counsel. After the record of the proceedings was compiled and a verbatim transcript prepared, the military judge entered written findings of fact in accordance with this court's order, and the record was returned to this court.

Additional relevant background information is included in the analysis of Appellant's various claims below, as appropriate.

**2. Law**

The Sixth Amendment[19] guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). In assessing the effectiveness of counsel, we apply the standard set out in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence as stated in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *See Gilley*, 56 M.J. at 124 (citation omitted). We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009)).

We utilize the following three-part test to determine whether the presumption of competence has been overcome: (1) are the appellant's allegations true, and if so, "is there a reasonable explanation for counsel's actions;" (2) if the allegations are true, did trial defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers;" and (3) if trial defense counsel were deficient, is there "a reasonable probability that, absent the errors," there would have been a different result? *Id.* (alteration and omission in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)).

The burden is on the appellant to demonstrate both deficient performance and prejudice. *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citation omitted). "[C]ourts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Id.*

---

[18] The order also specified an additional issue—closely related to Appellant's ineffective assistance claims—on which the parties were directed to file briefs after the record was returned to this court.

[19] U.S. CONST. amend. VI.

(quoting *Strickland*, 466 U.S. at 689) (additional citation omitted). We will not second-guess reasonable strategic or tactical decisions by trial defense counsel. *Mazza*, 67 M.J. at 475. With respect to prejudice, a "reasonable probability" of a different result is "a probability sufficient to undermine confidence in the outcome" of the trial. *Datavs*, 71 M.J. at 424 (quoting *Strickland*, 466 U.S. at 694) (additional citation omitted).

### 3. Analysis

We have carefully considered Appellant's numerous allegations regarding ineffective assistance of counsel, and we conclude he has not demonstrated he is entitled to relief. Not all of Appellant's arguments require discussion, but we address the most significant of them below.

### *a. Advice and Preparation Regarding Appellant Testifying*

Appellant asserts his trial defense counsel were ineffective by failing to adequately prepare him to testify for findings and sentencing. Appellant maintains he had an honest and reasonable belief MB wanted to spend time with him alone and engage in sexual activity short of sexual intercourse during the June 2019 camping trip. Appellant contends he could have provided testimony that would have assisted the Defense. For example, in his declaration and testimony during the additional proceedings, Appellant claimed that the physical contact between himself and MB during their alert shift together was much more extensive and intimate than the shoulder massage MB described at trial, and that in MB's tent they engaged in mutual touching that MB seemed to enjoy. Moreover, Appellant asserts that the cross-examination risks were minimal because he had no "skeletons in the closet," and numerous witnesses could have been called to testify to their opinion of his character and reputation for truthfulness if he testified. *See* Mil. R. Evid. 404(a); Mil. R. Evid. 608(a). Although Maj PR spent multiple hours with Appellant preparing him for direct examination in the event he elected to testify, none of his trial defense counsel practiced cross-examination with him. Appellant contends that although he understood his civilian trial defense counsel were strongly opposed to him testifying, they did not adequately explain why. Although Appellant understood it was his decision whether to testify for findings, he contends that at his trial he did not feel prepared and believed he had little choice but to accede to the recommendations of his counsel.

In response, trial defense counsel confirmed that Maj PR practiced direct examination with Appellant in case he testified. However, all three trial defense counsel were consistently opposed to Appellant testifying for findings. Trial defense counsel's general strategy was to portray MB's memory and testimony regarding the charged offenses as unreliable, and that she either consented or Appellant reasonably believed she consented. However, if Appellant

testified, trial defense counsel believed he would corroborate significant negative portions of MB's testimony that would significantly undermine their strategy. For example, Appellant would agree that MB did not specifically invite Appellant to her tent; that Appellant observed MB vomiting outside her tent after he arrived; and that Appellant removed MB's tampon (although Appellant would say MB told him to). In addition, trial defense counsel expected (correctly) the text messages between Appellant and MB to be introduced, which included Appellant's denials that they "had sex" and his belief that the encounter had been consensual, thus enabling the Defense to argue these points in support of their strategy without Appellant's testimony. Maj PR also produced a written document, dated the day before Appellant's trial, wherein Appellant acknowledged in writing that it was "up to [Appellant] whether or not [he] testif[ied] in any portion of the trial. And, it is very important that [he] be prepared for testimony if [he is] considering possibly testifying in [his] trial."

The military judge's findings of fact after the additional proceedings generally supported that trial defense counsel had competently prepared and advised Appellant with regard to his potential testimony. Among other relevant findings, the military judge found trial defense counsel did explain their concerns to Appellant in a timely manner, and that Appellant made a "knowing, intelligent, and voluntary choice" not to testify during findings. To some extent, the military judge's findings contradicted Appellant's declarations and testimony at the post-trial hearing; however, the military judge's findings are generally supported by the testimony of trial defense counsel, and we do not find them clearly erroneous.

Specifically with regard to Appellant potentially testifying for sentencing, Appellant delivered an oral unsworn statement during presentencing proceedings. *See* R.C.M. 1001(d)(2)(C). Appellant contends "[u]nsworn statements, by definition, are less credible than testimony under oath," that Appellant had "nothing to fear" from cross-examination, and "[t]here could be no reasonable strategy justifying the failure to prepare him and call him as a witness" for sentencing. However, Appellant's unsworn statement consisted principally of uncontroversial information about his own background and accomplishments, much of which was supported by sentencing evidence. Appellant does not explain how the substance of any sentencing testimony would differ from what he delivered in his unsworn statement, or how the fact that it was unsworn specifically inhibited his ability to provide information to the military judge.

Accordingly, we do not find Appellant has overcome the presumption that his trial defense counsel were competent with respect to the possibility that he would testify. Based on the military judge's findings and the totality of the record, trial defense counsel's performance did not fall measurably below the standard expected of fallible lawyers. Their advice that Appellant not testify

was a reasonable strategic choice. Moreover, they adequately advised Appellant regarding his right to decide whether to testify, and although they might have done more to specifically prepare for testimony—for example, by rehearsing a cross-examination—Appellant has not demonstrated the Defense was unprepared to proceed if he had elected to testify.

### b. Evidence of Appellant's Pertinent Character Traits

Appellant contends trial defense counsel were ineffective by failing to present evidence during findings proceedings of Appellant's good character traits. *See generally* Mil. R. Evid. 404(a)(2)(A) ("The accused may offer evidence of the accused's pertinent character trait . . . ."). Appellant notes trial defense counsel did not ask any questions of any witness regarding Appellant's good character, despite the availability of numerous such individuals—including several who testified at trial. He contends that given the nature of the charged offenses, evidence of his positive character traits for peacefulness, non-violence, law abidingness, respectfulness toward women, and—to a lesser extent—his general military character would have been relevant and admissible. *See United States v. True*, 41 M.J. 424, 426 (C.A.A.F. 1995); *United States v. Clemons*, 16 M.J. 44, 47 (C.M.A. 1983); *United States v. Williams*, No. ACM 39461, 2019 CCA LEXIS 442, at *26 (A.F. Ct. Crim. App. 31 Oct. 2019) (unpub. op.) (implying trial defense counsel had the option "to present evidence of [the a]ppellant's character for respect towards women"); Mil. R. Evid. 404(a)(2)(A) ("General military character is not a pertinent character trait for the purposes of showing the probability of innocence of the accused for offenses under [*inter alia* Articles 120 and 129,] UCMJ."). Appellant's post-trial declaration asserts trial defense counsel led him to believe character evidence was not admissible for findings, and he asserts his counsel "likely . . . were under the mistaken view that such evidence was inadmissible at findings." Appellant contends such favorable character evidence might have tipped the balance of the evidence in his favor, and there was no valid strategic or tactical reason not to introduce such evidence.

All three trial defense counsel responded to Appellant's argument on this point to some extent. Read together, their declarations present several themes. First, they acknowledged they were aware of many individuals who could have provided positive character testimony for Appellant. Second, although they denied telling Appellant that character evidence was not admissible at all in findings, they believed such evidence was of limited admissibility and usefulness in Appellant's case. Third, they expressed an expectation that the trial military judge's awareness of Appellant's status as an F-22 pilot, as well as his status as a United States Air Force Academy (USAFA) graduate and his impressive academic achievements, would create positive inferences as to Appellant's character even in the absence of opinion or reputation evidence of specific

character traits. Fourth, trial defense counsel expressed concern regarding certain evidence the Government might use to impeach positive character evidence under Mil. R. Evid. 404(b). The Government had provided notice of evidence that Appellant had attempted to cultivate an unprofessional relationship with a junior female enlisted member of his unit shortly before they both went on a temporary assignment to Las Vegas, Nevada. Specifically, the Government had evidence that Appellant had added the Airman as a friend on Snapchat, told the Airman he thought she was "cute," asked her if she thought he was "cute," and began a "game" whereby each had to answer questions from the other.

For the additional proceeding, the military judge was directed to make a number of specific findings regarding this aspect of Appellant's ineffective assistance claim. Some evidence developed during the factfinding hearing weakened certain aspects of trial defense counsel's rationales for not presenting positive character evidence. For example, trial defense counsel acknowledged that during findings the trial military judge was not presented with information that Appellant was a USAFA graduate or about his educational achievements, and that the Government's Mil. R. Evid. 404(b) evidence may not have impeached evidence of Appellant's character for peacefulness or non-violence. Additionally, several potential witnesses who were questioned about the Mil. R. Evid. 404(b) evidence during the hearing indicated it would not have changed their opinion of Appellant's character. However, on the whole, the military judge's findings of fact generally supported the conclusion that trial defense counsel made reasonable strategic and tactical decisions. The following portion of the military judge's findings substantially summarizes his conclusions as to why trial defense counsel did not present favorable character evidence:

> The trial defense counsel considered whether to present evidence of the character traits listed above and made a conscious decision not to present such evidence. The trial defense counsel determined that the evidence would be of little probative value under the facts and circumstances of the case. The trial defense counsel believed that presenting such evidence would serve as a distraction from the thrust of the defense theory they pursued. In addition to the potential for distraction, the trial defense counsel had concerns that presenting such evidence could be perceived as desperation on their part. Additionally, the trial defense counsel were concerned by the potential that presenting such evidence opened the door to cross-examination questions of witnesses expressing an opinion of the Appellant's law abidingness, respect for women, and good military character, specifically as it related to the Appellant's communications with a junior female [A]irman. The concern was valid for several reasons.

27

First, the trial counsel had only provided the trial defense counsel with the notice of this evidence and indicated they only intended to introduce such evidence if the [D]efense opened the door to its admissibility. Practically speaking, this means the military judge was unaware of the existence of this information because no motions were raised respective to this matter. While the military judge would have only considered this evidence for a proper purpose, the trial defense counsel did not want to have the military judge exposed to this information if it could be avoided. Next, should witnesses be confronted with this information on cross-examination, the trial defense counsel were presented with a no-win situation. Either the witness, upon hearing such information, would change their opinion of Appellant's character, or the witness would remain steadfast in their opinion, which could demonstrate bias in their testimony in favor of the Appellant.

The military judge's findings of fact are supported by evidence, and we do not find them clearly erroneous.

Based on the military judge's findings, we conclude Appellant has failed to demonstrate deficient performance. Under the circumstances, trial defense counsel could reasonably conclude positive character evidence was unlikely to have a significant impact in this case. They might reasonably believe the trial military judge would find it unremarkable that Appellant's friends, family members, and colleagues would testify they believed Appellant, an F-22 pilot, had a "good" character and a reputation for peacefulness and non-violence, obeying the law, and being respectful toward women. The trial military judge might also expect Appellant to have a "good" military character, to the extent such a trait was pertinent for the Article 128, UCMJ, offenses. On the other hand, we agree with the military judge who presided over the additional proceeding that it was reasonable for trial defense counsel to seek to avoid giving the Government the opportunity to inject its Mil. R. Evid. 404(b) evidence into the proceedings.

### c. Evidence of MB's Character for Untruthfulness

Appellant's initial brief asserted "plenty of opinion and reputation evidence exists indicating that [MB] is untruthful, manipulative, and untrustworthy." Appellant cited declarations from several potential witnesses, whom Appellant had identified to trial defense counsel before trial and who stated in their opinion MB was untruthful, untrustworthy, deceptive, manipulative, or failed to take responsibility—or words to that effect. Appellant notes trial defense counsel failed to elicit such testimony at trial, and asserts they failed to adequately investigate the matter.

In response, trial defense counsel's declarations asserted they did investigate MB's character for truthfulness during witness interviews. However, those witnesses who expressed negative opinions about MB's truthfulness appeared to have inadequate bases for those opinions. Instead, those opinions appeared to be related to criticism of MB as a pilot, or disapproval of her based on their perception that MB made statements or complaints about discrimination within the organization, rather than known instances of lying. In addition, trial defense counsel encountered at least one witness who had a positive impression of MB's character for truthfulness. Maj PR additionally stated he researched MB's character for truthfulness through other sources, including social media accounts, without finding anything useful for the Defense.

For the additional proceedings, the military judge was directed to address several questions related to the adequacy of trial defense counsel's performance in this area. Several witnesses testified regarding this subject, including some witnesses who had prepared post-trial declarations for Appellant. The military judge's findings of fact were generally consistent with trial defense counsel's declarations: that trial defense counsel identified several witnesses who had a poor opinion of MB, but these opinions were grounded in her performance as a pilot or perceptions that she complained about discrimination rather than for being untruthful. Trial defense counsel did not find witnesses who purported to know of specific lies told by MB. The military judge's findings are supported by evidence and not clearly erroneous.

We conclude Appellant has not overcome the strong presumption of trial defense counsel's competence with respect to MB's purported character for untruthfulness. Trial defense counsel did explore the matter to a significant extent. Given the weakness of the apparent bases for such character evidence, trial defense counsel did not fall measurably below the performance expected of defense counsel.

### d. Mil. R. Evid. 412 Evidence

#### i) Additional background

Before trial, the Defense moved to admit evidence of certain alleged prior sexual behavior by MB pursuant to Mil. R. Evid. 412.[20] The Government and MB (through counsel) opposed the defense motion in part. The military judge conducted a closed hearing to address Mil. R. Evid. 412 matters raised by the Defense and Government. Appellant did not testify during the closed hearing. In the course of the hearing, trial defense counsel somewhat modified the Defense's requests, but maintained the request with regard to certain alleged

---

[20] The Defense subsequently supplemented its motion in response to the Government's motion to admit Mil. R. Evid. 412 evidence, as described in Section II.B, *supra*.

behavior MB engaged in with Appellant prior to the night of 22 June 2019, as well as certain alleged behavior on the night of the charged offenses. After the hearing, the military judge issued a written ruling in which he permitted some of the Mil. R. Evid. 412 evidence the Defense sought to admit, specifically evidence that Appellant gave MB a "shoulder and back massage" during their alert shift together, and that they urinated together during the June 2019 camping trip. The military judge excluded other evidence of MB's alleged actions and statements during the June 2019 camping trip, in part because the Defense made an insufficient showing these statements and actions were directed toward, or made in the presence of, Appellant.

### ii) Analysis

On appeal, Appellant contends trial defense counsel were ineffective with respect to several forms of Mil. R. Evid. 412 evidence of MB's alleged sexual behavior that would have been admissible to "repudiate the Government's argument that [MB] was only interested in women, and thus did not consent." Appellant argues trial defense counsel were aware of this evidence because Appellant had informed them of it and had identified potential witnesses whom he believed would corroborate this behavior. Appellant particularly emphasizes evidence he could have provided had he been called to testify for limited purposes of the motion—including alleged flirting and suggestive dancing he engaged in with MB prior to the June 2019 camping trip, much more extended and intimate physical contact with MB during the alert shift than MB would admit to, and sexual comments and other behavior by MB during the camping trip. Appellant contends trial defense counsel failed to even advise him that testifying solely for purposes of the Mil. R. Evid. 412 hearing was an option.

In response, trial defense counsel's declarations explained they contacted the potential witnesses Appellant identified, but these witnesses generally failed to corroborate MB's behavior with Appellant and other males as Appellant thought they would. They reported these results to Appellant, who "seemed to understand," in Maj PR's words. Trial defense counsel recognized Appellant could testify for purposes of the motion; however, Mr. GG explained that even if the military judge allowed the evidence, "in order to have anything more than an unchallenged denial from [MB]" in evidence for findings, Appellant would have to testify for findings—which all three counsel consistently opposed for reasons stated above. Furthermore, Mr. GG asserted, even if this evidence of prior behavior was admitted:

> [W]e were still left with the fact that [MB] claimed to have been highly intoxicated, that she was asleep in her tent, that she did not invite [Appellant] to her tent, that she vomited prior to the sexual activity, and that she was on her period.[ ] In other words, even if the two had a prior dating and sexual relationship, on

that particular night she may not have consented to any sexual activity. In addition, the aforementioned facts could arguably make any mistake of fact as to consent unreasonable.

Trial defense counsel additionally explained that if Appellant ultimately decided to testify, they anticipated requesting an additional Mil. R. Evid. 412 hearing and revisiting some of the military judge's prior rulings, based on the evidence Appellant could provide. However, Appellant ultimately elected not to testify.

Trial defense counsel's handling of defense Mil. R. Evid. 412 evidence was addressed at the factfinding hearing, where Appellant, trial defense counsel, and other witnesses provided evidence generally consistent with their declarations. This court's order directed the military judge for the additional proceeding to make findings specifically with regard to the allegation that trial defense counsel were ineffective with respect to advice about Appellant's "right to testify at a Mil. R. Evid. 412 hearing." The military judge found, *inter alia*, that trial defense counsel did identify one witness who saw what the witness considered flirtatious behavior between Appellant and MB prior to June 2019. However, the witness did not corroborate the more suggestive physical contact and dancing Appellant had described, and caveated that his perception of flirting might have been a misinterpretation. Trial defense counsel also identified witnesses who corroborated that Appellant and MB urinated together; that at one point MB sat on Appellant's lap and poured alcohol into his mouth at the campfire; and that MB made two arguably suggestive comments while with the group at the campfire, although there was no corroboration that those comments were directed to Appellant specifically. Other behavior by MB that Appellant described was not corroborated. The military judge further found trial defense counsel's strategy with respect to Mil. R. Evid. 412 evidence was "to present such evidence or testimony if it could be corroborated from sources other than the Appellant," and to avoid subjecting Appellant to cross-examination. Moreover, had Appellant elected to testify, "the [D]efense intended to seek admission of all aspects of the Appellant's interactions with MB in the years, days, and hours leading up to the incident." The military judge found trial defense counsel explained to Appellant their strategy regarding the Mil. R. Evid. 412 evidence. Moreover, trial defense counsel discussed with Appellant the risks associated with him testifying generally, and although they did not expressly tell him he had a right to testify specifically at the Mil. R. Evid. 412 hearing, they believed Appellant "understood this right as it was implicit in their advice to the Appellant that should [he] testify in findings, [he] would also testify at the Mil. R. Evid. 412 hearing in order to establish the basis of the underlying evidence."

Although the military judge's findings contradict Appellant's declarations and testimony to some extent, those findings are supported by evidence and are not clearly erroneous. Based on the military judge's findings and the totality of the record, we conclude Appellant has failed to demonstrate trial defense counsel's performance fell measurably below the performance expected of fallible lawyers. Trial defense counsel might have advocated the admissibility of certain Mil. R. Evid. 412 evidence more aggressively, although such evidence was unlikely to be decisive. In addition, they might have more thoroughly ensured Appellant understood that he personally could choose to testify for a limited purpose at the Mil. R. Evid. 412 hearings. However, trial defense counsel's strategic emphasis on undermining the reliability of MB's purported memory and testimony rather than attempting to justify Appellant's behavior, and their reluctance to have Appellant testify, were reasonable decisions under the circumstances of the case. We are not persuaded Appellant has overcome the strong presumption of competent representation.

### e. Impeachment of MB's Recovered Memory of Penetration

Appellant contends trial defense counsel were deficient by failing to adequately investigate whether MB's purported recovered memory of being penetrated by Appellant was false. As described in Section I, *supra*, MB initially did not report a memory of being penetrated by Appellant at the time she was interviewed for her SAFE and by the OSI. During her testimony, MB stated she recovered this memory on 15 August 2019, and reported it by phone to her then-SVC, Maj HG. MB first disclosed her recovered memory of penetration to trial counsel during an interview shortly before trial in November 2020.

In his initial brief, Appellant asserted trial defense counsel had reasons to believe MB's testimony that she told Maj HG about the recovered memory of penetration was false. First, when MB had previously informed Maj HG of other recovered memories shortly after her initial OSI interview, Maj HG had sent these to OSI via email; but such a communication had not occurred with respect to the memory of penetration. Second, an SVC would have communicated such a significant memory to law enforcement or trial counsel. Third, an SVC would not have allowed such a memory to go undisclosed during important phases of the pretrial process, including the pretrial investigation pursuant to Article 32, UCMJ, 10 U.S.C. § 832. Appellant argued trial defense counsel should have immediately attempted to contact the SVC "to confirm [MB's] testimony was false." Appellant's declaration stated he asked trial defense counsel to do so, and they responded that such a communication between MB and her SVC was privileged. However, Appellant asserted on appeal, MB waived such a privilege by voluntarily testifying about the communication. *See United States v. McCollum*, 56 M.J. 837, 842 (A.F. Ct. Crim. App. 2002). Appellant contended that if trial defense counsel pressed the issue, either the

military judge would have ruled the privilege was waived, and the SVC would have testified (he presumed) that MB had not reported the recovered memory; or the military judge would have found the privilege applied, in which case the Defense would have preserved the issue on appeal.

Mr. GG addressed these arguments in his declaration, offering several rationales for not seeking to elicit information from Maj HG, or potentially from MB's other SVCs, about MB's disclosure of her recovered memory of penetration. First, trial defense counsel considered that the available information already enabled the Defense to impeach MB on this point, for similar reasons to those articulated by Appellant's brief—in short, it did not seem credible that MB had disclosed such a memory to Maj HG in August 2019, yet it had not been reported to OSI or trial counsel until November 2020. Second, if the Defense moved to compel evidence from an SVC, the SVC would presumably invoke attorney-client privilege; if the military judge ruled in favor of the Defense, an appeal to this court pursuant to Article 6b, UCMJ, 10 U.S.C. § 806b, seemed likely. Such a course would likely result in the trial being delayed, and Appellant had previously "expressed a strong preference to avoid a continuance." Third, it was possible that Maj HG or one of the other SVCs would actually corroborate MB's testimony, which would of course be unhelpful. Fourth, even if no SVC recalled receiving such a report from MB, the Government could argue the "turnover" between SVCs taking place in August 2019 meant MB made the report but it "fell through the cracks" and was overlooked.

This court's order directing additional proceedings instructed the military judge to investigate several questions related to how trial defense counsel dealt with MB's testimony regarding her recovered memory of penetration. Perhaps the most salient development during the additional proceedings was Maj HG's testimony that MB did, in fact, call Maj HG in August 2019 and inform her about the recovered memory of penetration. Maj HG further testified she did not "recall exactly what [she] did with the information," but she "believe[d]" she would have relayed it to OSI. Maj HG's testimony indicates that seeking to elicit information from MB's SVCs at the time of trial would not have produced a more favorable result for Appellant, and in fact tended to validate one of Mr. GG's stated reasons for not following this course.

Appellant's supplemental brief contends that, notwithstanding Maj HG's testimony, trial defense counsel were ineffective by failing to adequately impeach MB's testimony of her recovered memory with the information available to them at trial. In particular, Appellant contends trial defense counsel should have contrasted Maj HG's email to OSI reporting MB's three other recovered memories shortly after the initial OSI interview, on the one hand, with Maj HG's failure to relay in any fashion MB's purported recovered memory of penetration, on the other. We find Appellant has not demonstrated deficient

performance. Trial defense counsel did call the lead OSI agent for Appellant's case to testify, *inter alia*, to the effect that as of 30 September 2019, when OSI received a "clarification" from MB's then-SVC regarding the neck massage, OSI had not been informed of MB's recovered memory of penetration. In addition, Dr. CR's testimony about alcohol and memory tended to support the Defense's theory and argument that MB's memories of the charged offenses were unreliable and became more unreliable over time. In other words, trial defense counsel did adduce evidence tending to cast doubt on the reliability of MB's purported recovered memory. Given the strong presumption in favor of competence, we are not persuaded Appellant has demonstrated trial defense counsel's tactics to deal with MB's recovered memory of penetration fell measurably below the expected standard of performance.

### f. Defense Sentencing Evidence

During presentencing proceedings, the Government presented the testimony of MB's mother, GB, and her former girlfriend, HH, who testified regarding the impact of Appellant's offenses. The Government also introduced a personal data sheet with basic information about Appellant, and his official training, education, and performance reports, which were favorable to Appellant. MB presented oral and written versions of an unsworn statement describing the impact of Appellant's offenses. The Defense presented the testimony of Appellant's father, BK; Appellant's oral unsworn statement; photographs from Appellant's life and career; images of numerous awards, certificates, coins, and other forms of recognition Appellant had received; and over 50 character statements from Appellant's family members, friends, peers, and superiors.

Appellant contends trial defense counsel were ineffective with respect to preparing for sentencing. In particular, he argues they did not prepare any witness to testify as a defense sentencing witness, despite knowing many individuals were willing and able to do so, including a number who were present for the court-martial or in the local area during the court-martial. Appellant asserts it was only after findings were announced that trial defense counsel approached his family members and asked if one of them could testify during sentencing proceedings, at which point BK volunteered and testified with minimal preparation. Appellant further contends trial defense counsel failed to present certain favorable information about Appellant, including important duties he had been assigned and his retention of his security clearance in spite of the pending allegations and court-martial.

In response, Maj PR's declaration stated that he had worked extensively with Appellant to prepare sentencing matters. Mr. KS's declaration stated it was trial defense counsel's judgment that "one high-impact witness chosen from the family was the best course of action." He further explained: "[w]e do not impose rehearsals on sentencing witnesses. Over-preparation of a lay

witness, particularly of a family member, runs the risk of the testimony coming across as scripted and inauthentic. . . . We have found that sincere, unrehearsed testimony from a family member is far more persuasive." He concluded by stating, "as it turned out, the testimony was, as we had hoped, emotional and compelling."

For the additional proceedings, the military judge was not directed to, and did not, specifically address sentencing matters in his findings.

We find Appellant has not met his burden to demonstrate trial defense counsel were ineffective with respect to sentencing. The defense sentencing case was very extensive and effectively conveyed Appellant was widely respected, trusted, and admired by those who knew him, and had significant educational and professional achievements to his credit. Although trial defense counsel could have prepared multiple sentencing witnesses to testify, Appellant has not demonstrated such a course would have materially strengthened the Defense's sentencing case. Accordingly, we conclude Appellant has not demonstrated trial defense counsel's performance fell measurably below the performance expected of defense counsel, or—alternatively—a reasonable probability of a more favorable result were we to assume deficient performance.

## D. Appellate Delay

Appellant's record of trial was originally docketed with this court on 16 February 2021. Appellant requested and was granted nine enlargements of time before he filed his corrected brief with this court on 11 February 2022.[21] The Government filed its answer brief on 27 April 2022, after receiving an enlargement of time to obtain declarations from trial defense counsel. On 9 June 2022, after receiving another enlargement of time, Appellant filed a reply to the Government's answer.

On 28 September 2022, this court issued its order directing additional proceedings in the nature of a factfinding hearing pursuant to Article 66(f)(3), UCMJ. The additional proceedings were held on 13 December 2022 and 10–12 January 2023. The court reporter certified the verbatim transcript of the additional proceedings on 13 July 2023, amounting to 1,475 pages exclusive of the original transcript, and the military judge entered his written findings of fact on 9 August 2023.

---

[21] This court granted two motions to amend this pleading, filed on 12 and 13 February 2022.

The record was re-docketed with this court on 5 September 2023. Appellant filed a supplemental brief on 5 October 2023, and the Government submitted an answer on 14 November 2023.

"[C]onvicted servicemembers have a due process right to timely review and appeal of courts-martial convictions." *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citations omitted). In *Moreno*, the United States Court of Appeals for the Armed Forces (CAAF) established a presumption of facially unreasonable delay "where appellate review is not completed and a decision is not rendered within eighteen months of docketing the case before the Court of Criminal Appeals." *Id.* at 142. Where there is a facially unreasonable delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice [to the appellant]." *Moreno*, 63 M.J. at 135 (citations omitted). The CAAF identified three types of cognizable prejudice for purposes of an appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) "particularized" anxiety and concern "that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision;" and (3) impairment of the appellant's grounds for appeal or ability to present a defense at a rehearing. *Id.* at 138–40 (citations omitted). Where there is no qualifying prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). We review de novo an appellant's entitlement to relief for post-trial delay. *United States v. Livak*, 80 M.J. 631, 633 (A.F. Ct. Crim. App. 2020) (citing *Moreno*, 63 M.J. at 135).

Over 18 months have elapsed since Appellant's record of trial was originally docketed with this court. Accordingly, under *Moreno* there is a facially unreasonable delay in the appellate proceedings. Although Appellant has not raised appellate delay in his assignments of error, we have evaluated the *Barker* factors. Appellant has not specifically alleged cognizable prejudice, and we find none. In particular, we have found no material prejudice to Appellant's substantial rights and affirm his sentence; therefore, we find his confinement has not been "oppressive" for purposes of our *Moreno* analysis. Furthermore, we find the delays involved in Appellant's case have not been so egregious as to adversely affect the perception of the military justice system. The initial delays arose from Appellant's motions for enlargements of time to prepare a very lengthy and thorough brief with numerous supplemental documents. The delays before the Government's answer and the court's additional proceedings order are largely attributable to the extent and complexity of Appellant's assignments of error, particularly his claims of ineffective assistance of counsel. The delays in conducting the factfinding hearing and preparing the transcript

and record are again not egregious in light of the number of witnesses and the nature, scope, and complexity of the proceedings. From the time the record was re-docketed, appellate review has proceeded without unreasonable delay. Additionally, we note Appellant has not made a demand for speedy appellate review. Accordingly, we find no violation of Appellant's due process rights.

Recognizing our authority under Article 66(d), UCMJ, we have also considered whether relief for excessive post-trial delay is appropriate in this case even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002). After considering the factors enumerated in *United States v. Gay*, 74 M.J. 736, 742 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we conclude no such relief is warranted.

## III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to Appellant's substantial rights occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court